I'm Jim Horstman. I represent the appellant, ABM. Good morning, your honors. I'm Tom Orlando. I represent the appellees. Okay. We typically give 15 minutes to each side. We don't have anybody coming in after you, so if you go a little bit over, you're not going to get zapped by any buzzer. Speak up. The microphones here do not amplify. They're just for recording, so keep your voices up so we can all hear you. Okay? Thanks. Good morning. May it please the Court, again, I'm Jim Horstman. Together with my co-counsel, Melissa Dokich, we represent ABM, the appellant in the case. By way of background, ABM is a janitorial company that does janitorial work in a building owned by MB. It's the Northwestern train station here in town. MB owns and manages that building. ABM is in there on a contract basis providing janitorial services. A man named Detrani was involved in a slip and fall in the building, got injured. He sued MB and ABM for his injuries. He pleaded the counts against ABM and MB separately, totally distinct counts. That case went to trial. The jury found in favor of Detrani, finding 18 percent charged against Detrani. MB was found to be responsible for 53.3 percent. And my client, ABM, was found responsible to the extent of 28.7 percent. ABM paid its share. MB wants ABM to pay MB's share. So the building owner wants the janitorial company to pay the building owner's share. The basis for MB's claim is that in the relationship between the janitorial company and the building owner, the janitorial company, my client, agreed to indemnify MB for certain limited risks related to the janitorial company's work on the premises. There's really three contractual provisions that are potentially in play. The service contract between ABM and MB had an indemnification clause that required ABM to indemnify MB for liabilities arising out of the janitorial company's performance or failure to perform its contractual duties. And there's a couple of provisions in the insurance policy under which ABM agreed to indemnify MB for liabilities arising out of ABM's operations. Let me interrupt you briefly here. You've repeatedly referred to the duties of ABM as janitorial, but they're also providing certain maintenance functions. Is that right? They're performing maintenance duties in terms of snow removal, implementation and maintaining a recycling program, replacing light bulbs, tubes, ballasts, repairing all electrical problems related to lamping. In fact, it says ABM is responsible for all lighting maintenance. So in addition to a janitorial function, they're also providing a maintenance function. Would you agree with that? I would agree to a limited extent. Okay. Yeah. They have a maintenance function. Their duties are defined by that contract, and the contract goes beyond merely sweeping floors. Right. It includes maintenance, right? Right. Endorsement 46 is the other one. It says ABM has to indemnify MB for liability arising out of ABM's operations, but only to the extent that MB would be indemnified under the service contract. Now, the briefs, because they're written by coverage nerds, are predisposed to argue about various language differences between the endorsements and the contract. And that's what we do. And you say they're coverage people. But is this really an insurance coverage case? There's not an insurance company as a party. That's true. So how is it that this isn't simply a pure contract case relating to the service contract agreement as opposed to an insurance coverage case where there's no insurance company as a party to the case? Because ABM agreed both to indemnify contractually and to procure insurance for MB. Under the service contractor agreement, right? Through terms of it. But that insurance is in play because ABM has a $1 million self-insured retention, which follows the form of the policy above it. I understand your thinking here, but how is it in play in the sense that the insurance company, ACE, is not a party to the litigation? How can a court adjudicate the duties and responsibilities of an entity that's not a party to the case? How do we have jurisdiction in that regard? No, I think you're right. And ACE is not a part of this. Fortunately, the aggregate liability didn't get up beyond the level of self-insured retention. But are you asking us to interpret insurance policy provisions and determine duties and responsibilities? ACE is necessarily implicated there, aren't they? No, I think not, Judge. It's because ACE doesn't come on until the self-insured retention is exhausted. So unless there's an aggregate liability above the $1 million self-insured retention, ACE isn't part of it, and that's why the parties have never tried to bring them in. So if the verdict had been higher, we might be in that situation? Yeah. We might have found ourselves in that situation. Yeah. But the verdict exceeds $1 million, right? But not on the percentages when you... Right. So ACE just, they're not potentially involved here. But that is, it's a little odd. We're talking about insurance policies, but it's because it's within the self-insured retention, which is governed by the same terms as the policy. But really, that probably gets to a technical point that nobody really needs to reach. I think the broader question that spans all of the issues and really provides the answer for the whole case is a simpler one. And it's really, has MB shown that the Detrani claim against MB arose out of ABM's work, operations, whatever words you want to use, is MB's liability attributable or derivative of ABM's liability? The burden on this falls on MB. MB is the one who's seeking to recover under these indemnification clauses. This court's standard of review is de novo. There is a discussion in the briefs about the chancery judge's rationale. She kind of shifted rationales through the course of things. As it turns out, MB doesn't even try to justify the particular rationale. But it's kind of a moot point because the standard of review is de novo. In the briefs, there's said a lot about this disagreement we have. ABM believes that endorsement 46 controls. MB believes that endorsement 8 controls. For purposes of this argument, I think we should look at it in the terms most favorable to MB. I'm going to assume for the sake of argument that endorsement 8 applies. And I think the answer ultimately is the same under 8 or 46. The court needs to determine whether there's a duty to defend and a duty to indemnify. Let's start with the duty to defend. Duty to defend is predicated on the allegations of the underlying complaint. That's the Detrani first amended complaint. So framing the issue in terms favorable to MB under endorsement 8, the question is whether the first amended complaint alleged liability against MB arising out of ABM's operations. So we look to the complaint to see if there's any allegations that say that MB is liable due to ABM's operations. And the answer is no. The way this was played is that certain counts against ABM, certain counts against MB, they were essentially identical. Most of the allegations of negligence are premises allegations. They really go more appropriately to MB that you've got faulty roof allegations. You've got failure to warn allegations. There are no allegations of vicarious liability. There's nothing in the complaint that says that MB is going to be liable because ABM messed up. Nothing like that. The allegations are almost exclusively premises liability sorts of allegations. Now, in the counts against MB, there's no mention of ABM. There's no mention of the service contract. They're just directed as direct negligence allegations against MB. The trial judge, and to a large extent MB, has said that, well, under the whole race jest, under the whole collection of facts and the whole pleading, it's clear that Rocco Detrani could have alleged that MB, the building owner, was responsible for the acts of its agent, ABM. Now, the fact of the matter is Detrani never alleged that there was an agency relationship, never alleged that MB is liable because of something that ABM did or failed to do. They didn't want to add to their burden of proof, right? I mean, why add another issue to the case if they don't have to? Could be. There's going to be coverage for the plaintiff either way. Is that right? Yeah. Well, I think it's even broader. The plaintiff wasn't put to the test on the pleadings. He alleged all these premises allegations against both parties identically. Apparently, there wasn't motion practice to sort that out. So the plaintiff didn't have any interest in segmenting out or separating these kind of allegations. The answer to MB's argument and to the trial judge's argument that, well, liability is this court's opinion in Pekin v. Roszak ADC where the appellate court says it's not the way you do it. You don't look to what might have been pled. You look to what was actually pleaded. And if you're going to find a duty to defend, you have to be able to point to some language in the pleading that's a source for that. And somewhat coincidentally, this Pekin v. Roszak ADC involves additional insured-type issues in a similar scenario where, hypothetically, maybe a plaintiff could have pled something else that would have triggered the additional insured coverage, but he didn't. And this court said we have to focus on the language of the complaint. So our conclusion on the duty to defend issue is it's a simple one. You look solely to the allegations of the underlying complaint. Even if endorsement A governs, there's no duty to defend because there's no allegations that MB's alleged liability was based on anything that ABM did or failed to do. All those allegations point to what MB, as the premise's owner, did or failed to do. So that's our conclusion on the duty to defend. Simple. Lots of argument in the briefs, unfortunately. But all this court has to do is look at those allegations, and that's the answer. Moving to the duty to indemnify issue. Duty to indemnify doesn't look to the allegations, but looks to the actual findings against the parties. And here, so we do have a source here. The Detrani case was tried. We have the verdict. So the question, again, phrased in terms of endorsement eight, is whether the jury verdict rendered against MB was based on liability arising from ABM's operations. Again, there's a lot that's said in the briefs, but it comes down to this court looking at the verdict. And the verdict's pretty simple. What we find when we look at the verdict is that this is not a vicarious liability case. The verdict form specifically asked the jury to separate out the specific percentages of negligence of each of the defendants. Actually, each of the parties, because they had the plaintiff in there, too. The jury did find against each defendant individually and allocated a separate percentage of negligence to MB and to ABM. And the jury found that MB was about twice as culpable, causally negligent, as ABM, which, in our view, on its face completely destroys MB's argument that the verdict against MB was somehow derivative of something ABM did or failed to do. ABM, the janitor company, comes in with the lower percentage of fault. And the building owner, as you might expect, comes in with something about double that. Did your janitors go up on the roof? No. Yeah. I mean, were your janitors people that would go up there with some tar and try to repair the leaks up there? No. Do they have any responsibility at all when these repeated leaks would come out that, you know, Were your people sent upstairs? No. No. But the leaks have gone on for more than the term of this contract. And you've had this same contract for, what, 11 years? Yeah, a long time. So the leaks have been present through different iterations of this same contract or different contract periods. I don't think that's strictly a part of this record. It came out in the trial. I guess I'm just my question is a little different. My question is if you knew that there were these leaks when the janitorial maintenance company signed up for the new version of the contract and they still hadn't been fixed and you weren't going to be responsible for fixing them because you'd never been responsible for fixing the leaks, why isn't there some language in this contract that says, oh, but we're not responsible for those leaks? It was a contract drafted by MB, the building owner. Again, I'm not sure how much of this comes into the record. I mean, it's kind of a contract of adhesion. Right. But the fact of the matter is that ABM never assumed responsibility for fixing the roof. But you did assume responsibility for putting down slip-proof mats and warnings, those cones and things, and mopping up whenever there were leaks or water or slush or whatever tracked in from the outside. This happened in December. We can expect that it was wet outside. Again, a lot of that gets into what the trial was about. In this case, we've never gotten into the extent of the duty to put out mats. I think the reason we haven't gotten into it is because they're required to put out mats by doors, not in the middle of the train station. That's in the contract, the insurance contract, though, right, and in the service contract. In the service contract. There is a requirement that where there's water, you put down mats and warnings and redirect traffic. That was the janitorial company's job. Is that correct? I'm not sure that that's right. But I defer to the contract on that. Okay. I'm pretty sure I read that. Since we got you interrupted, let me interrupt you again and ask you to talk for a moment about what you brought up just a minute ago, that this is sort of a contract of adhesion. Is that your argument, that this, you know, is a contract of adhesion or that the contract itself is some way void and being against public policy? No, no, no, no. We were getting into some questions that kind of go outside this record. Okay. We weren't putting provisions in the contract anticipating leaks from the roof because it's the fact of the matter. We didn't have any. It was a take-it-or-leave-it contract. But I don't ask the court to consider that in support of our position. Right. With respect to the duty to indemnify, MB was a party in that Detrani case. It had control over what verdict forms were submitted to the jury. If MB had wanted the jury to find whether its liability was based on acts or failures of ABM, it could have had a special interrogatory to that effect. What it's tried to do in this case is, having decided not to get special interrogatories, to come up with a general verdict, to then come back and ask the courts to assume that the building owner's liability is based on what ABM did or failed to do. And it's a fine argument, hypothetically, but there's absolutely nothing in the record to support the contention that MB's liability, its 50-whatever percent, was in any way based on the operations, the contractual work of ABM. Is that forfeited by them in your judgment, then, since they did not submit a special interrogatory that would have tested that issue? In effect, yes, Your Honor. It's clearly their burden on this issue. That's one way that they could have actually been probably no appeal, if they would have submitted a special interrogatory and gotten an answer to that. What they can't do is to decide not to give a special interrogatory, come out with a general verdict, and then ask this Court to guess as to what the basis was. So our conclusion on the duty to indemnify issue is, again, it's pretty simple. You look at the verdict and see if that supports MB's burden of proof on this issue. And it doesn't, because the general verdict doesn't tell us, doesn't even suggest that MB's liability was derivative of ABM's conduct or misconduct in the case. Now, I know my clock is running here, but up to now we've been assuming that endorsement 8 applies, because that is a way to view the case most favorably in favor of MB here. But the fact of the matter is that ABM's position is that it's not endorsement 8, it's really endorsement 46. Hey, can I ask you a question? If ACE isn't involved and the policy, the ACE policy is not implicated, then why is the language of the endorsements or the endorsements at all relevant? Because the, it goes back to the, ABM agreed separately to both indemnify and procure insurance for MB, and it satisfied that obligation with respect to insurance by getting a policy that was subject to a $1 million SIR. But that SIR is controlled by the same terms as the policy above it. So it's, again, there's no effort on either side to bind ACE to any of this, but the endorsements are relevant because they define how the SIR is to be formed. Okay. So it's just used for clarification of the agreement. Right. Okay. Right. Okay. Endorsement 46 is potentially significant here. As I said, I think even if MB is right that endorsement 8 governs, I think we win this case. But if not, our case is much stronger with endorsement 46. Because 46 is exactly like 8, but it adds one additional condition prerequisite for ABM's indemnification duty. It indemnifies under the same conditions as 8, but it adds one more condition, and that is but only to the extent that MB would be indemnified by the service contract. And it sounds a little circular, but MB wants to avoid 46 like the plague, and that's why this case has spun off into the reformation. But didn't 46 issue after the date of the accident? It did. It did. And that's undisputed, Your Honor. And that's why we get into reformation. What ABM brought out was uncontested affidavits of ABM and ACE and the broker who issued the policy all saying, oops, 46 was intended to be on the policy at the outset. Uncontradicted by any other evidence in the case. Literally all of the evidence in the case reflects that 46 was supposed to have been on the policy, but it wasn't. And we asked Judge Pantley, if nothing else, let us go back and try the reformation claim. I don't think we need to because literally all of the evidence supports the reformation claim. MB doesn't want 46 because it's impossible for MB to show that its liability arose out of ABM's failure to perform its contract. Because ABM didn't have any obligation to keep the roof safe, to maintain a safe premises, any of the premises liability obligations. So it makes MB's case a lot harder. We asked the court to reverse. We asked the court to enter judgment affirmatively for ABM, both on the duty to defend issue and the duty to indemnify issue. We think that endorsement 46 should apply. We think that the court, as a matter of law, could award reformation because all of the evidence in the record goes to support reformation. But it's probably an academic question because even if you follow MB's theory that endorsement 8 governs this, even under endorsement 8, there's no duty to defend because you look at the allegations of the complaint, no duty to indemnify because you look at the findings of the jury. So they really can't support the burden under 8 or 46 or the service contract. And the briefs have gone off on a lot of tangents, but it just comes down to that. Can they support the burden that the allegations and the finding of the jury against MB arose out of things that ABM did or failed to do? There are a lot of other things in the briefs. I'll rest on my griefs rather than take any more of the court's time. And I thank you. Thanks, counsel. May it please the court. Again, my name is Tom Orlando. I represent the appellees. Obviously, we believe that the duty to defend and indemnify exists under endorsement 8, endorsement 46, and under the service contractor agreement. And that leads me to my first point, which is somewhat procedural. There is a suggestion in ABM's brief that in analyzing the coverage issue and the duty to defend issue, that the court cannot go beyond the four corners of the complaint and cannot look at the service contractor agreement. And I believe that both the trial court and this court may do so and has to do so. At issue in this case, as framed by ABM's pleading, is whether or not the insurance policy provides coverage. The two endorsements that are at issue, 8 and 46, refer to the underlying contract. And they only give my client and the insured status if there is some requirement in the underlying contract to name my client as an additional insured. That necessitates looking at the service contractor agreement. The coverage analysis cannot be performed without looking at the underlying contract. Let me ask you, in looking at the underlying service contractor agreement, would you likewise, as did your opponent, concede that the service contractor agreement is, in essence, a maintenance agreement as well? I agree it is. It's both janitorial and maintenance. And in this case, because of the arising out of work language that appears in endorsement 8, in endorsement 46, and in the indemnification provision of the service contractor agreement, we have to look at, well, what does that mean, arising out of the work? What's the work? It's entirely proper for this court to look at how the contract defines the work. Counsel suggested that, well, it's not in our record. I agree that there's not a lot of factual development. There is some facts on this. There were depositions that were taken on this. But it's defined in the contract. And I think, Judge Kuczynski, you were right. The record does reflect that. And it's not disputed. Their briefs do not dispute that ABM was to dry up wet floors, put the little signs on, put the mats down. That was within the scope of their work. But their work did not include fixing the leaky roof. That's correct. Okay. My client's responsible for the roof. Their client's responsible for mopping up wet floors, putting down the warning signs, putting down mats. I don't think that's in dispute. That's within the contract document. There actually is some deposition testimony in the record on that. I don't believe there's a dispute that within this contractual scope of ABM's work is to mop up wet floors. And that's important as we define or look at what the arising out of language means. In the underlying case, you have a general verdict. And the fault is apportioned in the percentages that you folks are quite familiar with. It seems to me that just looking at it on a facial basis here, the jury could have concluded that the plaintiff didn't, you know, was a little bit inattentive, but not so much. And that you folks, you know, you had a problem with this roof and you never dealt with it properly. And that the janitorial service, maybe they were a little slow to the draw in getting the mats down. So that it would seem that, you know, there were three parties. They each had some negligence and the jury carved it up accordingly with your client getting the lion's share of it because you had the most notice of the ongoing problem. Is that fair? There's no dispute that my client was tagged with the lion's share of the fault. That's undisputed. But what's significant about that, or actually not significant about that, is that the coverage issue here, this is not about proximate cause. This is not about who was most at fault. What was the proximate cause of the injury? It's a but-for analysis. The arising out of language that appears in endorsement 8, in endorsement 46, in the underlying contract, has been interpreted by this court to mean a but-for analysis, not proximate cause. The issue is, and my client can say, yes, we were found to be at fault for not fixing the roof, but but-for ABM's not mopping up the wet floor, none of us would be here. Sure, ABM can make the same argument. They can say, yeah, but but-for MB not fixing the roof, we would not be here either. And that's what this underlying contract is about. The parties, ABM and MB, acknowledged that there might be injury that is sustained when we're both at fault. And what are we going to do? And you're saying under this underlying contract that ABM has agreed to indemnify MB for MB's negligence. That's right. They bought the risk. With that in mind, let me ask you, have you considered the application of the Construction Contract Indemnification for Negligence Act? I don't think it's relevant here because I don't think this is a construction scenario. This was not construction. This was a maintenance issue. The roof was not being constructed. Let me cite you to a pertinent part, I think, of the Construction Contract Indemnification for Negligence Act, which says with respect to contracts or agreements for the maintenance of a building, every covenant, promise, or agreement to indemnify or hold harmless another person for that person's own negligence is void as against public policy and wholly unenforceable so that we don't lose the motivation of a party to eliminate its own deficiencies in its properties, right? That's true, but again, the maintenance, whatever the scope of the maintenance obligation was here, it was not for the roof. I don't think that's disputed. But the point remains, it's a maintenance agreement, correct? You conceded that at the outset. I do concede that there are maintenance obligations under the contract that pertain to the scope of the work that's defined in the contract. But no one is suggesting that ABM had any responsibility to go up on that roof and repair the damage or whatever problems existed in the roof. The issue is it's kind of a hybrid agreement. This is a janitorial-slash-maintenance agreement, and you concede that point, right? I believe that there are maintenance requirements in it. In fact, when I look at your tender letter, and that letter was issued by a senior vice president for MV Real Estate, it says in the second paragraph, plaintiff's allegations that he slipped and fell on the premises as a result of a wet floor necessarily implicate the acts-slash-omissions of ABM Lakeside as the maintenance contractor for the building. That's what the letter says. But again, I think the maintenance, it's maintenance in a janitorial sense. It's what janitorial companies do. They don't make structural repairs to buildings, and that's not what this contract was. Do janitors do this? Do janitors remove snow? Do janitors implement and maintain a recycling program? Do janitors replace light bulbs, ballasts, and starters as required? Do janitors repair all electrical problems relating to lamping? I believe some of those items are, I think you're reading from the contract, I recognize some of those items. Yes, those are some of the services that ABM was to provide. Some of the maintenance services. If we're characterizing those as maintenance services, yes, but again, I don't believe that's within the scope of this because this was not a maintenance contract for the structural integrity of the building. The building wasn't under construction. They were not retained to maintain the structural integrity of the building. To me, it's not just the fact that a contract may have maintenance elements or can be called a maintenance contract. It's what's the scope of the maintenance obligation? And again, no one is suggesting that MB shifted responsibility to maintain the roof to ABM. It's not within the scope of the contract. Well, they maintain, didn't they, a clean or a dry, they're charged with the responsibility of maintaining a dry area when this leak occurs during wet weather. They're not mopping floors to get them clean. They're mopping floors to clean up water that's coming in through a roof. They're maintaining a dry area and putting out warning indications and such, right? I believe that regardless of the cause of wet floors, they would be responsible for keeping the floors dry. So whether it's a leaking roof. They're maintaining a dry area as opposed to cleaning the floor in this context, right? That's right. Okay. Again, the issue, it's not proximate cause. It's a but-for analysis under the arising out-of-language. And I did not focus on the Roszak case in my brief because it's also not a vicarious liability case. This is not about vicarious liability. We agree that Detrani in his underlying complaint alleged separate causes of action against ABM and against my client. And he did not allege a vicarious liability basis to hold my client liable. That was relevant in Roszak because the insurance coverage in Roszak was quite a bit different than the insurance coverage here. In Roszak, the additional insured endorsement said, is an additional insured only with respect to liability incurred solely as a result of some act or omission of the named insured and not for its own independent negligence or statutory violation. So it was a very limited coverage. It was basically coverage for vicarious liability, which necessitated this court looking at the underlying complaint to see if there were any facts that would support a finding of vicarious liability. We don't have that language, so it's irrelevant to see whether Detrani pled any facts that would give rise to vicarious liability. And we concede that he did not. He did state his counts independently of each other. We concede that. But it's not relevant because we have a different coverage grant. Our coverage grant in Endorsement 8 and 46 is the arising out of language. And again, that's a but-for test. And ABM says that, well, Detrani's complaint doesn't use the word or phrase arising out of. Well, that's not relevant either. Those are magical. That's a magic term of art that, again, coverage counsel and lawyers use. Roszak itself says that we're not looking at how the quality of the draftsmanship of the plaintiff's attorney in the underlying case, the job of the trial court in this court is to look at the allegations in the complaint to see if, actually, they fall within the arising out of work of the underlying contract. And here they do. This court, again, can look at Endorsement 8 and 46, can look at the underlying contract to define the work as including mopping up a wet floor. Clearly, mopping up a wet floor was in the scope of the work of ABM. And but-for, ABM's failure to mop up the wet floor, none of us would be here. That satisfies the but-for test. That satisfies the arising out of language, even though Detrani did not use arising out of in his complaint. That determination can be made based on the facts that he alleged. And that's the only standard that's relevant under Endorsement 8 or Endorsement 46. Now, there's a side issue with respect to Endorsement 46. Counsel was kind enough to say that he was going to make the first argument that he'd give us the benefit of the doubt that only Endorsement 8 applied. And I'm going to do the same thing now and extend the courtesy the other way and say, all right, let's say he's right and ABM's right and 46 is the operative endorsement. The result doesn't change. We still have the arising out of language and but-for analysis because that language is in Endorsement 46. Counsel's right. The only additional requirement in 46 that wasn't in 8 is that Endorsement 46 asks, is MB indemnified by ABM's written contract with MB? Again, that requires us to look at the underlying service contractor agreement to the indemnification provision. In doing so, did you consider any of the case law interpreting the act that I referenced? The Construction Act? Yeah. No, I did not. I looked at and we focused primarily on the Boends Illinois Supreme Court decision. Again, I don't believe the act applies in this case because I don't believe it's that type of maintenance contract. But it has not been briefed and I don't believe it's been looked at. I noticed that. But the act is written in the disjunctive. Construction, altercation, alteration rather than repair or maintenance of a building. It's your position that it does not apply in any setting other than a construction setting. Am I right? Well, to be honest with you, Your Honor, again, I have not looked at it. It was not addressed below. Nobody has addressed it. It's not addressed here. I would be happy to address it if the court would like supplemental briefs. It has not been addressed and in all honesty, I can't speak intelligently on it because it was not addressed. I don't think the court below or the parties considered this case to fall within that. We may all be wrong, but it has not been addressed. So when you say it has no application in this context, that's just your gut feeling on the spot. You really haven't considered this. That's right. I have not considered it. It has not been addressed. And I would be happy to do it at the court's invitation. Thank you. In looking at that underlying contract, I focused on the Buens decision making the assumption as well not the I made the assumption that in the Buens court I think there was a footnote where in that case they also distinguished their situation and said that act did not apply. And I've relied on the Buens decision for defining the scope of an indemnification contract. And again, we find we have the same arising out of language in this indemnification contract as we have in the endorsement. So you do the same but for analysis. There's a critical distinction here. In this indemnification contract, there is a disjunctive. It says that they have to indemnify, ABM has to indemnify my client if they're for their negligence or simply for their work. It doesn't require them to be negligent in order for them to have to indemnify my client. It can be one or the other. And that's distinguishable from some of the contracts that are discussed at length in Buens. And I believe the Buens court looked at the history and analyzed some appellate court decisions with various contractual language. Our language is very different. In a lot of those cases, the indemnification was very clearly limited to the negligence of the name insured. Well, in our case, it says, yes, the negligence of the name insured or simply the work that they perform. And, again, I think we all agree that the work includes mopping up a wet floor. So we believe that even under Endorsement 46, if we have to look at the underlying indemnification contract, the intent was to indemnify my client even for my client's own negligence. And that's made clear at the very end of the indemnification contract, where it specifically says that my client's right to indemnification under this section shall not be impaired or diminished by any of its own acts. That's even more express language that was not present in the Buens case that indicates that ABM's indemnification obligation here is very broad and applies to even situations where my client is negligent. The sort of side issue in all of this is whether or not we have to get that far because does Endorsement 46 even apply? And you really only get to the Buens analysis by way of Endorsement 46. Again, we think the Buens analysis applies in our favor regardless. But I don't think this is a reformation action. Counsel has conceded that that endorsement was not issued until long after this accident. There is no evidence of record that this was a supposed to situation. I think that was the word that counsel used, that somehow this endorsement was supposed to have been issued. The evidentiary record on this is clear. I think that ABM wanted Endorsement 46, and I do think there's a record of them asking for it. But they didn't get it when that policy was issued. They were still negotiating it. They accepted the policy as issued. They paid the premium. They took the policy with Endorsement 8. They conceded Endorsement 8 was on the policy as issued. They didn't reject the policy because it didn't have 46. They were still negotiating it. And that often happens in an insurance situation. That's what an endorsement is. Endorsements are something that are issued after the fact that changed some term in the policy. They were still negotiating this policy for long after its issuance, and the record is clear. It was on April 26, 2005, when some underwriter over at Ace finally said, we approve your request to change 8 into Issue 46. There was never any agreement before that. There is no mutual mistake. They didn't have a meeting of the minds. They didn't have an agreement until April 26, 2005, and then it was issued. It was issued. There's nothing to reform. It simply wasn't operative on the date of Detrani's injury. Endorsement 8 was operative. Unless there are further questions? I do have a question based on what Mr. Horstman was arguing about with the percentage of fault that was determined by the jury. Is it MB's contention that your liability arose out of ABM's negligence or ABM's performance of its contract duties? It arose out of the work. Okay. It arose out of the work. We don't know exactly how the jury came up with this. It could have been by carries. It could have been we didn't fix the roof and they're holding us for the roof. We don't know. All right. Fair enough. Arising out of the work. If that's the case and if MB is a party in the underlying case, which it was, isn't there some merit to his suggestion that you should have submitted a special interrogatory to the jury to test that issue to determine whether or not that, in fact, was the case? Or if they were whacking MB for 53% because they never fixed the roof? I don't believe so because, again, this is not a by carry. The coverage here is not limited to by carries liability. Under these endorsements, unlike the endorsement in ROSAC, we don't have to prove that we were found liable by virtue of by carries liability. We have different language than ROSAC. All we have to prove is that our liability arose out of their work. And it's a very simple standard. It's but for. But for their failure to mop up the floor, none of us would be here. And we're not supposed to say but for the failure of you guys to fix the roof for 10 years? As I said before, that works both ways. But I think ABM and MB, when they contracted, they acknowledged that someone might get injured and we might both be at fault for the injury. Who's going to pay for it? And they shifted the risk of loss to ABM. That was agreed to in this indemnification provision. If they contemplated this very scenario and they contracted to shift that responsibility to ABM, they could have done it the other way. They didn't. And so the percentages don't matter. All right. Thanks. Your Honor, this brief comment was made in reference to Pekin v. Wilson, whether this court can go beyond the four corners of the underlying complaint. In our brief, we laid out several reasons why Pekin v.  particular case allow the court to look beyond the four corners. The biggest and clearest reason is that Pekin v. Wilson says you can't do that if we would intrude upon the issues to be decided in the underlying case. And if you're going to be looking to the contract materials here, you would be looking to see which ABM's duties and MB's duties and the respective shares and responsibility that would directly have intruded upon what the jury was going to do in the underlying case. So I would also add that in making the argument that Pekin v. Wilson does not allow the court to do that in our opening brief, MB never came back to dispute that. You look at their brief. They didn't dispute our arguments that Pekin v. Wilson would not allow the court to look beyond the four corners. Let me ask you a question. Have you contemplated at all the act that I referenced and its implication in this case? Your Honor, I'm very embarrassed to say I have not. It was not raised in the court below so far as I'm aware. And no. You're familiar with the act? I am indeed. Are you familiar with the body of case law generated from that act? Generally. Okay. What's your view then? What's your position as it relates to the application of the act to the instant case? I'm about as prepared or unprepared as Mr. Orlando. I understand that. I understand your understanding. I know the act does go beyond the construction context, that there are cases that, not a lot of cases, but some cases stretch beyond a traditional construction site context. Some cases talk about strictly maintenance outside the context of a construction setting, right? Yes, I believe so. Yes. But I don't know those cases well enough to, in good faith, I would like to agree with what the court was suggesting, but I couldn't do it in good faith. I just don't know enough about it. Okay. Thank you. Counsel has relied a great deal on his view that it's a but-for test that applies here I'm not so sure he's right, but it doesn't help him. At the bottom line, it doesn't help him. Whether it's a but-for test or any other kind of test, he still is speculating as to what the jury found and on what basis, and he still cannot point to anything in this complaint that supports the theory that he has on but-for causation. He relies on fallacy. He keeps saying, but-for ABM's failure to mop up the water, we wouldn't be here. Well, it's not an absolute liability situation. I mean, he would be right maybe if he said that but-for ABM's negligent failure to mop up the water. But in the underlying case, there's all kinds of evidence about how long was the water there? Did ABM even have a chance to get out there to mop it up? It was one of those days where the water was just cascading down. So it's not as simple as but-for ABM's failure to mop up, none of us would have been here. A perfectly legitimate and intuitively truer analysis of this verdict is, as Your Honor, Justice Lavin said, the jury tagged the building owner for this terrible roof that's been leaking for years and failure to do other things that a property owner should do, but the jury also felt, well, maybe ABM could have gotten out there earlier to mop it up. That's the most natural interpretation. I don't have the burden here. MB has the burden, and they're asking the court to speculate on that. Counsel said at one point, we don't know what the jury found or why they found against MB. It could have been vicarious. No, it couldn't. They didn't have any instructions on vicarious liability. It wasn't pled. It wasn't argued. They couldn't have. Counsel read a little snippet from the Rose Act case. I'm not saying that it's factually on course with this case. What I was really looking at is a couple of sentences I would just like to take a second to read. The appellate court said, we cannot read into the complaint something that is not there. Instead, we must look to what the underlying plaintiff did allege and ascertain whether those allegations contain facts supporting the elements of a theory of liability that is covered by Pekin's policy. That's the point of Rose Act. You can't hypothesize what the plaintiff might have pled. You have to look to the complaint. On the reformation question, I think it's important to recall that we submitted four affidavits in support of the reformation claim. They're affidavits from the insured and the insurer and the broker. There was no evidence to the contrary. On appeal, M.B. challenges one of those four affidavits only. The other three remain unscathed on this appeal. He doesn't challenge them. So there's no evidence to contradict them, and he doesn't attack the credibility or substance of those. And so you have unchallenged, unrebutted affidavits of the insurer, the insured, and the broker all saying, we had this endorsement on our prior policies. We expected it to be on this policy. We gave M.B. a certificate of insurance containing the same language before the inception of the policy. They knew it was going to be on there. And the insured, the insurer, and the broker, the only parties who were involved with issuing the policy, all agreed, oops, it should have been on there. All the rest is just argument from counsel. There is no evidence to the contrary. Those affidavits show that there was a meeting of the minds, that it was intended that endorsement 46 would not only be on the policy but would expressly supersede endorsement A. It's undisputed that 46 was not physically on the policy. But when we talk about reformation, we're talking about it's a nunk-pro-tunk situation. It was intended to have been on the policy at its inception, and that's what we're asking Judge Pantley to rule. It is, I believe, on this record, can be established as a matter of law because all of the evidence supports only one view, that that endorsement 46 should have been on the policy. We've had a lot of time, and I thank Your Honor. Let me ask you. You get a sense of where some of my focus is by virtue of my questioning. Your opponent has indicated that he would be receptive to the court's invitation for supplemental briefs on the issue of the application of the Act to the facts before us. Would you likewise like to do that? Yes, Your Honor. I mean, it's intriguing. I'm afraid to say much because I don't know the research. I think we'd both be happy to do it. It's an intriguing thought. I have one more question. I'd just like to know what you have to say about the public policy of an indemnity in relation to a hazard that it knowingly has or has allowed to remain. It's another thing we didn't get into, but it's something we haven't argued in the case. But there is evidence in the underlying trial, in fact, that MB knew about this for a long time. It's tantamount to a prohibited agreement to indemnify somebody for their own intentional conduct. We don't have the evidence in this case, I don't think, for me to ask this court to consider that as grounds for reversing the judgment. But it just hasn't been developed, I don't think, enough on this record. It's certainly true, I think, as a matter of public policy, Illinois would not allow a party to indemnify itself for its own intentional conduct or maybe even willful and wanton in this context. Or under the Act, its own ordinary negligence. But that will be the subject of further briefing. Can you two work out an agreement as to how much time for each side to give us a brief on that issue, the potential application of the Indemnification Act? I want to make sure that we're both briefing the same issue. Okay. Would the court entertain, could we submit a statement of the question, maybe an agreed one, or would the court like to issue an order telling us what the issue is? We'll issue it. Okay, we'll issue it. Okay. All right, thank you very much. Thank you. Great, thanks. We're adjourned. Thanks. Great job on both sides.